[No. B011540. Second Dist., Div. Seven. Aug. 23, 1985.]

DAVID QUAIL, Petitioner, v.
THE MUNICIPAL COURT FOR THE LOS ANGELES JUDICIAL
DISTRICT OF LOS ANGELES COUNTY, Respondent;
UNION INTERCHANGE, INC., Real Party in Interest.

---

**COUNSEL**

David Quail, in pro. per., Mark D. Rosenbaum, Paul L. Hoffman, Joan W. Howarth and James J. Preis for Petitioner.

DeWitt W. Clinton, County Counsel, and H. Anthony Nicklin, Senior Deputy County Counsel, for Respondent.

Paul M. Guyer and Evan L. Murri for Real Party in Interest.

---

**OPINION**

**THE COURT.**\*—Petitioner's appeal from a judgment issued by the respondent court in favor of real party in its unlawful detainer action against

---

\*Before Lillie, P. J., Thompson, J., and Johnson, J.

him is pending in the Appellate Department of the Superior Court of Los Angeles County. In the instant proceeding petitioner principally contends (1) the respondent did not properly carry out the settlement and engrossment of the settled statement on appeal, and (2) the engrossed settled statement certified by the respondent does not accurately set forth the proceedings in the trial court. (Cal. Rules of Court, rules 127, 128.)

On June 12, 1985, this court stayed all proceedings on the appeal. By order issued June 26, 1985, we referenced the matter to the appellate department with directions that an evidentiary hearing be conducted, and written findings thereafter be submitted to this court, on the following issues:[1]

(1) Does the engrossed settled statement certified by the municipal court in case No. A65074 accurately set forth the oral proceedings of February 16, 1984, insofar as they are material to the determination of the points on petitioner's appeal?

(2) Was the settlement and engrossment of said settled statement properly carried out pursuant to the provisions of rule 127 of the California Rules of Court?

An evidentiary hearing was conducted by the appellate department on July 8, 1985, during which all of the parties to this proceeding were present or represented by counsel. Thereafter, on July 22, 1985, the appellate department complied with this court's order of reference by submitting the following written findings:

"Having taken judicial notice of the municipal court file in A65074 and of the superior court file in A16411, this court finds with respect to the second question as follows:

"(1) Petitioner complied fully with the California Rules of Court, Rules 121 and 127(a), respectively, in filing his notice of appeal and in serving and filing his proposed statement on appeal.

"(2) Real party in interest did not file, nor attempt to file proposed amendments to petitioner's proposed statement on appeal.

"(3) The court set June 15, 1984 as the date of hearing to settle the statement on appeal.

---

[1]The stay of proceedings previously issued was modified to permit the appellate department to conduct such hearing.

"(4) Both petitioner and counsel for real party in interest were present on June 15, 1984 at the hearing to settle the statement on appeal. The court continued said hearing to July 31, 1984.

"(5) On June 22, 1984 real party in interest filed a document improperly entitled 'Proposed Statement on Appeal', which document was not timely filed as proposed amendments to the proposed statement because it was not filed within ten days after service of the proposed statement as required by Rule 127(a) of the California Rules of Court.

"(6) On July 31, 1984, the date to which the hearing to settle the statement on appeal had been continued, petitioner appeared; however, no appearance was made on behalf of real party in interest. The hearing to settle the statement on appeal was continued to August 2, 1984.

"(7) Petitioner orally represented to this court that on August 1, 1984 he telephoned the clerk of respondent court and requested a continuance of the hearing to settle the statement on appeal. The clerk informed petitioner that she would advise him of the date to which the hearing would be continued; however, petitioner was not so advised. The municipal court file does not reflect the telephone call.

"(8) On August 2, 1984 respondent court held the hearing to settle the statement on appeal. Petitioner was not present. An appearance was made on behalf of real party in interest. The court ordered real party in interest to engross the settled statement on appeal for the court's approval.

"(9) The purported engrossed settled statement on appeal bears the trial judge's signature.

"Based upon the foregoing, this court finds, with respect to question 2, *supra,* that the settlement and engrossment of the settled statement on appeal herein was not properly carried out pursuant to the provisions of Rule 127 of the California Rules of Court, at least in the following respects:

"(1) Contrary to the requirement of Rule 127(c) that the judge shall settle the statement and fix the time 'in which *appellant* shall engross it as settled', the trial judge ordered *respondent* to engross the statement on appeal.

"(2) Petitioner was never served with a copy of the settled statement as engrossed in accordance with the judge's order and therefore had no opportunity to make objections thereto. This fact served to compound the error reflected in the foregoing paragraph.

"(3) Although bearing the signature of the trial judge, the engrossed settled statement does not contain the trial judge's certification that the statement accurately and truly reflects the oral proceedings of February 16, 1984. Nor have the parties stipulated that the statement does so reflect said proceedings. (See *Potter v. Solk* (1958) 161 Cal.App.2d Supp. 870, 871-872.)

"This court has not determined whether the engrossed settled statement accurately sets forth the oral proceedings of February 16, 1984. That determination is not made at this time because it appears that remand to respondent court will be required in order to settle the statement on appeal in conformity with the requirements of Rule 127." (Italics in original.)

We adopt the foregoing findings of the appellate department and conclude therefrom that petitioner is entitled to relief.

We further conclude this is an appropriate matter in which to issue a peremptory writ of mandate in the first instance. (Code Civ. Proc., § 1088; see also *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893].)

Accordingly, It Is ORDERED as follows:

(1) The engrossed settled statement certified August 7, 1984, in case No. A65074 and filed in the appellate department September 13, 1984, in case No. A16411 is hereby stricken. (Code Civ. Proc., § 923.)

(2) Let a peremptory writ of mandate issue, requiring the respondent court (a) to grant to petitioner twenty (20) days from the date of issuance of the remittitur in this proceeding,[2] to serve and file a condensed statement of the oral proceedings pursuant to rule 127(a) of the California Rules of Court, and (b) thereafter to proceed to settle the statement in conformity with the provisions of said rule 127.

In all other respects the petition is denied.

Except insofar as necessary to comply with this opinion and order, the stay order issued herein June 12, 1985, and modified June 26, 1985, shall continue in force pending the filing in the appellate department of an engrossed settled statement properly certified by the respondent court pursuant hereto.

---

[2] See rule 25(a), California Rules of Court.

This opinion shall be deemed final as to this court ten (10) days from the date hereof. (Cal. Rules of Court, rule 24(c).)

**JOHNSON, J.,** Concurring and Dissenting.—I concur in the issuance of the peremptory writ as far as it goes. However, I dissent from the cursory denial of petitioner's further requests for appointment of counsel on appeal and at trial.

This court already has recognized the petitioner is indigent by granting him leave to proceed with this appeal in forma pauperis. Thus, the only issue is whether California courts lawfully can be used to deprive this admittedly indigent civil defendant of a valuable property right without affording him the lawyer needed to effectively defend him and his legal rights in these forums. I am of the opinion counsel should be appointed under both the California common law and California constructions of due process and equal protection which are applicable to the general run of civil defendants. In addition, however, other constitutional considerations support the grant of free counsel to this particular petitioner even if the average impoverished litigant is to remain naked of legal assistance in California's civil courtrooms.

I. Indigent Mental Incompetents Who Are Defendants in Civil Cases Are Entitled to Appointment of Counsel Under Due Process Clause of Federal and California Constitutions

Petitioner Quail asks for appointment of a lawyer not just because he has money problems but because he has mental problems. This mental infirmity is confirmed by the lengthy, rambling, disjointed, confusing handwritten series of petitions Quail filed with this court. It is further supported by Quail's claim his main source of income is a mental disability pension. Thus, for him, the issue is very narrow—can California courts lawfully deprive an indigent of valuable property rights without giving him a lawyer where he is mentally incapable of defending himself in those forums.

To ask this question would seem to answer it. For many years before the United States Supreme Court incorporated the Sixth Amendment guarantee of free counsel into the Fourteenth Amendment (*Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792]) it relied on the due process clause to define when the Constitution required appointment of counsel for state criminal defendants. (*Betts* v. *Brady* (1942) 316 U.S. 455 [86 L.Ed.2d 1595, 62 S.Ct. 1252].) This was a flexible standard requiring case-by-case analysis of the complexity of the particular charge and the capabilities of the individual defendant.

Significantly, one of the few bright line rules to emerge from this pre-*Gideon* era is that due process does not tolerate denial of counsel to a mental incompetent. As the court observed in a unanimous opinion in *Massey* v. *Moore* (1954) 348 U.S. 105, 108-109 [99 L.Ed. 135, 138, 75 S.Ct. 145]: "No trial can be fair that leaves the defense to a man who is insane, unaided by counsel, and who by reason of his mental condition stands helpless and alone before the court. Even the sane layman may have difficulty discovering in a particular case the defense which the law allows. See *Gibbs* v. *Burke,* 337 U.S. 773. Yet problems difficult for him are impossible for the insane." (See also *Wade* v. *Mayo* (1947) 334 U.S. 672, 684 [92 L.Ed. 1647, 1654, 68 S.Ct. 1270], "There are some individuals who, by reason of age, ignorance or mental capacity, are incapable of representing themselves adequately in a prosecution of a relatively simple nature. . . . Where such incapacity is present, the refusal to appoint counsel is a denial of due process of law under the Fourteenth Amendment.")

This same unanimous court in *Massey* v. *Moore* made it clear a litigant need not be incompetent to stand trial in order to be mentally deficient enough for due process to mandate appointment of free counsel. "One might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel." (348 U.S. at p. 108 [99 L.Ed. at p. 138].) Similarly, we need not find petitioner requires commitment to a mental institution or appointment of a conservator in order to find he lacks the mental capacity to defend himself in California courts.

It is true *Massey* v. *Moore* and like cases arose in the context of criminal proceedings. Nonetheless, they articulated minimum standards demanded by due process—a clause which applies to civil as well as criminal cases—not the Sixth Amendment which applies only to the latter. If it is not merely difficult but impossible for a mental incompetent to defend himself without counsel in a criminal prosecution, it is just as impossible for him to do so in a civil case. And, even if due process eventually can be twisted to somehow tolerate imposing on normal poor people the *difficult* task of defending their property rights in the courts without lawyers, it can never be so stripped of meaning as to foist that task on those for whom it would be an *impossibility*—mentally incompetent poor people. That is tantamount to sanctioning legalized robbery—using the coercive power of the state to force defenseless people to surrender their property without a *meaningful* hearing.

Appointing free counsel for petitioner would only extend the right to counsel to a very small category of civil litigants. Accordingly, it would not have significant ramifications for the courts, the legal profession, or the rest of the legal system. (But if it did, see discussion at pp. 585-591, *infra.*)

Seldom can such a major step toward equal justice be accomplished at so little cost.

## II. A RIGHT TO COUNSEL EXISTS IN CALIFORNIA FOR ALL INDIGENT CIVIL DEFENDANTS UNDER THE COMMON LAW AND THE UNITED STATES AND CALIFORNIA CONSTITUTIONS

The denial of counsel to petitioner Quail also overlooks an inchoate *common law* right to counsel which has existed in California since 1850 and was implicitly recognized by the California Supreme Court in 1919. Furthermore, the majority's ruling fails to acknowledge the existence of a constitutional right to counsel in appropriate civil cases. Independent of his mental condition, I would hold petitioner Quail qualifies for appointment of free counsel under both the common law and the due process and equal protection clauses of our national and state Constitutions.

### A. *An Inchoate Right to Free Counsel for Indigent Civil Litigants Exists Under California Common Law*

Indigent California litigants have possessed an inchoate right to counsel in civil cases under the common law since 1850, shortly after this state's Constitution was adopted. (*In re Javier A.* (1984) 159 Cal.App.3d 913, 954 fn. 37 [206 Cal.Rptr. 386] (dictum).) Since that date the "common law of England, so far as it is not repugnant to nor inconsistent with our constitution and laws" is "the rule of decision in all the courts of this state." (Pol. Code, § 4468, now Civ. Code, § 22.2 quoted in *Martin* v. *Superior Court* (1917) 176 Cal. 289, 292 [168 P. 135].)[1] At the time Political Code section 4468 was adopted, 1850, English common law provided indigent *civil litigants* with a right to proceed in forma pauperis. Moreover, this English in forma pauperis right entitled indigent litigants to the assistance of appointed counsel without charge.

In 1919 the California Supreme Court expressly ruled that indigent California litigants were entitled to the same in forma pauperis right conferred on indigent Englishmen prior to 1850. The case before the Supreme Court, *Martin* v. *Superior Court, supra,* 176 Cal. 289, involved the issue of whether an indigent is entitled to waiver of court fees. The court acknowledged

---

[1] The applicable English common law has been defined by California courts as "the whole body of that jurisprudence as it stood, influenced by statute, at the time when the code section was adopted. And more than that, that it embraced also . . . the great handmaiden and coadjutor of the common law, equity." (176 Cal. at p. 293.) This definition has been followed in later California cases, e.g., *People* v. *One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 286-291 [231 P.2d 832]; *Moore* v. *Purse Seine Net* (1941) 18 Cal.2d 835, 838 [118 P.2d 1]; *People* v. *Richardson* (1934) 138 Cal.App. 404, 408 [32 P.2d 433].

that no California statute provided for waiver of court costs. Thus, the court looked to the English common law as it existed in 1850. The court rested its decision on definitions of the English common law in forma pauperis right it found in the writings of the leading English commentators, Blackstone and Marshall. The court first quoted from Blackstone, COMMENTARY ON LAW (1780): " 'And paupers . . . are, by statute (Stats. 11 Hen. VII, c. 12), to have original writs and *subpoenas gratis,* and *counsel and attorney assigned them without fee;* and are excused from paying costs, . . .' " (176 Cal. at p. 294.) (Second italics added.) Supporting Blackstone's definition of the English common law in forma pauperis right, the court quoted "Marshall in his 'Law of Costs in all Suits and Proceedings in Courts of Common Law' (p. 347)," as follows: " 'With a view to enable such poor persons as have not ability to pay the expenses incidental to the prosecution of an action to enforce their rights, they may, upon such inability being shown, be admitted to sue *in forma pauperis.* When so admitted the plaintiff is exempt from the payment of court fees, and *he is entitled to the service of counsel, and of an attorney,* who render their services without reward. . . .' " (176 Cal. at pp. 294-295.) (Second italics added.)

In *Martin* v. *Superior Court,* the petitioner was already represented by counsel on a contingent fee basis. Hence the court had no reason to apply the right-to-counsel component of the English common law in forma pauperis right. But it did render choate another part of Blackstone's and Marshall's definition of an Englishman's in forma pauperis right. The California Supreme Court held indigent Californians were entitled to waiver of court fees for the specific reason that they were entitled to the same in forma pauperis right as indigent Englishmen.

In the intervening 68 years since *Martin,* the California Supreme Court has not expressly ruled whether California civil litigants are entitled to another part of the in forma pauperis right indigent Englishmen have enjoyed since the late middle ages—the right to a free lawyer. In fact, the court has yet to address this issue at all, probably in large measure because uncounseled litigants are unlikely to recognize they have procedural rights derived from the mists of early English history. Furthermore, any lay persons who did happen on this knowledge seldom will possess the legal background and skill to wend through the procedural maze standing between them and the California Supreme Court.

Significantly, however, the California Supreme Court has endorsed the *Martin* rationale when skilled lawyers were able to present another ingredient of the indigent Englishman's in forma pauperis right for adoption in California. Thus in *Ferguson* v. *Keays* (1971) 4 Cal.3d 649 [94 Cal.Rptr. 398, 484 P.2d 70] the court made choate the right to waiver of appellate

fees. Once again the court reiterated California's in forma pauperis entitlement was defined by the English common law as it existed when California became a state in 1850. The waiver of appellate fees in California was specifically justified on the finding that "several English cases prior to 1850 . . . had expressly recognized such a right." (4 Cal.3d at p. 654.)

When some resourceful, lucky indigent lay person finally reaches the California Supreme Court with this issue, the reasoning of *Martin* and *Ferguson* should also render choate the right to free counsel in civil cases. Certainly, "English cases prior to 1850 . . . had expressly recognized such a right." (See, e.g., *Olfield* v. *Cobbett* (1845) 41 Eng.Rep. 765 and cases mentioned in W. J. Jones, The Elizabethan Court of Chancery [1967] pp. 324-28, 501.) Furthermore, a statutory right to counsel had existed in England at least since the enactment of a statute of Henry VII in 1495 and thus had become a part of the English common law absorbed by California in 1850. This statute reads in pertinent part: "And after the seid writte or writtes be retorned, . . . the Justices . . . shall assigne to the same pou psone or psones Councell lerned by their discrecions which shall give their Councelles nothing taking for the same, and in like wise the same Justices shall appoynte attorney and attorneyes for the same pou psone and psones . . . which shall doo their duties without any rewardes. . . ." (Statute of Henry VII, 1495; 11 Hen. VII, ch. 7; 2 Statutes of the Realm 578 (transcribed in 2 Stat. 85) (repealed 1883, 46 & 47 Vict. ch. 49), reprinted in S. Pollock, Legal Aid— The First 25 Years (1975) p. 10.)

It is difficult to escape the conclusion that in the field of civil litigation California's indigents are entitled to the same in forma pauperis right as English serfs have enjoyed since medieval times[2] and this right includes

---

[2]Courts of Appeal also have held the California in forma pauperis right is defined by the English common law. In *County of Sutter* v. *Superior Court* (1966) 244 Cal.App.2d 770 [53 Cal.Rptr. 424] another part of that right was rendered choate when indigent California litigants were exempted from a statute requiring deposit of cost bonds in lawsuits against the government. The court's reasoning is directly applicable to the right to counsel, especially in light of the Statute of Henry VII mandating appointment of free counsel for indigent civil litigants in England. The *Sutter* court held: "California's adoption of the 'common law' embraced common law jurisprudence in general, including its existent statutory modifications. . . . In the reign of Henry I (1100-1135) an ordinance requiring security was mitigated for the poor by a provision ' "that those who had not sufficient present security should pledge their faith to make satisfaction to the utmost of their power." ' . . . The authorities justify the conclusion that the common-law power embraced waiver of security for costs as well as suspension of fees." (244 Cal.App.2d at p. 774)

Another Court of Appeal used the same sort of analysis to find a right to waiver of bonds on appeal in pre-1850 England. As a result this too became a part of the informa pauperis right enjoyed by California poor people. (*Roberts* v. *Superior Court* (1968) 264 Cal.App.2d 235 [70 Cal.Rptr. 226].)

appointment of free counsel. After *Martin* and *Ferguson* we now only await the dropping of the next shoe.[3]

## B. *The Constitutional Rights to Free Counsel in Civil Cases*

Since the common law right to counsel is so clear under California law, I shall only briefly summarize the constitutional doctrines. At the threshold it should be highlighted the California Supreme Court has never ruled indigents can be constitutionally denied an attorney in a civil action. In fact, the court expressly reserved this question in the leading case of *Payne* v. *Superior Court* (1976) 17 Cal.3d 908, 926-927 [132 Cal.Rptr. 405, 553 P.2d 565]. The Supreme Court's only excursions into this area have been to extend the right to counsel in civil cases not to deny it. (*Payne* v. *Superior Court, supra,* 17 Cal.3d 908; *In re Jacqueline H.* (1978) 21 Cal.3d 170, 178 [145 Cal.Rptr. 548, 577 P.2d 683] [statute construed to allow appointment of counsel in order "to avoid constitutional infirmities"]; and, *Salas* v. *Cortez* (1979) 24 Cal.3d 22 [154 Cal.Rptr. 529, 593 P.2d 226] [extending the right to counsel to civil paternity actions].)

### 1. *Constitutional Right to Counsel Under Due Process*

Prior rulings of California courts have established constitutional premises sufficient to support a right to counsel far beyond that already acknowledged in *Payne* and *Salas.* The California Supreme Court, unlike the federal courts, has construed due process to create a right to counsel in civil cases

---

[3]The only Court of Appeal decision to consider the common law right of counsel in civil cases, *Hunt* v. *Hackett* (1973) 36 Cal.App.3d 134 [111 Cal.Rptr. 456], cert. den. (1974) 419 U.S. 854 [42 L.Ed.2d 87, 95 S.Ct. 99], did not distinguish nor even attempt to distinguish the right to counsel from other parts of the in forma pauperis right expressly incorporated into California law by the Supreme Court. Instead it upheld the trial court's denial of counsel with the unsupported boot strap declaration that "current and past practice of California courts is compelling authority for the ruling of the trial court in this case." The court did not cite any authority, compelling or otherwise, for this proposition. (See, e.g., criticism in Comment, *Current Prospects For An Indigent's Right To Appointed Counsel And A Free Transcript In Civil Litigation* (1976) 7 Pacific L.J. 149.) The Court of Appeal's rationale or lack of rationale in *Hackett* would not warrant mention but for one consideration. It suggests how overripe this issue is for full blown consideration at the appellate level. By the circular reasoning employed in *Hackett,* a hodgepodge collection of unrelated orders from trial judges who never even considered the possibility of a common law right to counsel has somehow been construed to create an illusion of "current and past practice in California courts." The *Hackett* court, in turn, sought to use this illusion to avoid confronting the underlying issue of whether the common law right exists. I believe an inchoate right to counsel has long existed for indigent civil litigants and will be recognized and enforced by the California Supreme Court. However, if this right is to be extinguished that act also should be performed by the Supreme Court in an opinion which directly confronts the issue of the applicability of the *Martin-Ferguson* rationale to this aspect of the in forma pauperis right. The right cannot be extinguished by an accretion of brief orders and offhand rulings which do not rise above the trial court level.

which parallels almost exactly the language of the Sixth Amendment in criminal cases. The Sixth Amendment on its face does not create a right to *free* counsel for indigent criminal defendants. Rather the amendment only promises "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." (U.S. Const., Amend. VI.) Indeed it was 149 years after the adoption of the Constitution before this language was construed to require appointment of free counsel for those unable to afford the necessary legal fees in federal criminal cases.[4]

Meanwhile in a line of cases starting with *Mendoza* v. *Small Claims Court* (1958) 49 Cal.2d 668 [321 P.2d 9] the California Supreme Court has created a right to the assistance of counsel in civil cases which is indistinguishable from the language of the Sixth Amendment. In *Mendoza* a tenant lost an unlawful detainer action in small claims court where he was not entitled to have a lawyer. He then pursued a trial de novo in the superior court where he would be entitled to a lawyer. The Supreme Court held he could not be dispossessed while his trial de novo was pending because the small claims hearing did not give him a full measure of due process. The court explained: " 'There can be little doubt but that in both *civil and criminal* cases the right to a hearing includes the *right to appear by counsel,* and that the arbitrary refusal of such right constitutes a deprivation of due process.' " (49 Cal.2d at p. 673.) (Italics added.) Later the court held unconstitutional a rule requiring the posting of an undertaking in order to appeal from a small claims court judgment. It based this ruling on the rationale that "the undertaking or deposit requirement constitutes a taking of property, without a due process hearing with representation by counsel, and . . . such requirement is constitutionally impermissible." (*Brooks* v. *Small Claims Court* (1973) 8 Cal.3d 661, 668 [105 Cal.Rptr. 785, 504 P.2d 1249].)

Just as under the federal Constitution's Sixth Amendment, an accused cannot be deprived of his *liberty* without "the right . . . to have the assistance of counsel for his defense," under California due process interpretations, a civil litigant cannot be deprived of *property* "without a due process hearing with representation by counsel." Since the courts have construed the Sixth Amendment language to create a right to free counsel for indigent criminal defendants, the nearly identical language defining the essentials of

---

[4]Federal statutes required appointment of free counsel for indigent defendants for much of our nation's history. Still it was not until 1938 in *Johnson* v. *Zerbst* (1938) 304 U.S. 458 [82 L.Ed. 1461, 58 S.Ct. 1019], that the United States Supreme Court finally construed the Sixth Amendment to create a constitutional right to free counsel for indigents in federal felony prosecutions. It took another 25 years before the court applied this requirement to the states. (*Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792].)

due process in California justifies a like construction in favor of indigent civil litigants.[5]

## 2. *Right to Counsel Under Equal Protection Clause*

Prior California rulings on equal protection likewise suggest error in the denial of a right to counsel for indigent civil litigants. The California Supreme Court, unlike the United States Supreme Court, has held poverty can be a "suspect classification" at least when an important interest is at stake. (*Serrano* v. *Priest* (1976) 18 Cal.3d 728, 765-766 [135 Cal.Rptr. 345, 577 P.2d 929], cert. den. (1977) 432 U.S. 907 [53 L.Ed.2d 1079, 97 S.Ct. 2951].) Effective access to the courts also qualifies as a "fundamental interest."[6] *Payne* itself expressly held "to be heard in court to defend one's property is a right of *fundamental* constitutional dimension; in order to justify granting the right to one group while denying it to another, the *state must show a compelling state interest.*" (17 Cal.3d at p. 919.)[7] Particularly in view of the complexity of civil litigation in California courts "like access to the courts" and the opportunity "to be heard in court to defend one's property" can only be realized if a litigant has "the guiding hand of counsel at every step of the proceedings."[8] In California, moreover, under *Mendoza*

---

[5]This California definition of what due process *requires* when property interests of any dimension are at stake creates a unique ground for a constitutional right to appointed counsel in this state. But a due process right to counsel in civil cases also can be found in federal due process guarantees. (See, e.g., Note, *The Right To Counsel In Civil Litigation* (1966) 66 Colum.L.Rev. 1322; Note, *The Indigent's Right To Counsel In Civil Cases* (1967) 76 Yale L.J. 545; Note, *The Emerging Right Of Legal Assistance For The Indigent In Civil Proceedings* (1976) 9 U.Mich. J.L. Ref. 554.) Even the United States Supreme Court has recognized that in some civil cases due process may require appointment of free counsel for indigents. (*Lassiter* v. *Department of Social Services* (1981) 452 U.S. 18 [68 L.Ed.2d 640, 101 S.Ct. 2153].) I have not pursued these federal grounds in this opinion because indigent civil litigants in this state need look no further than California's own common law and constitutional rulings.

[6](See, e.g., *Barbier* v. *Connolly* (1885) 113 U.S. 27 [28 L.Ed. 923, 5 S.Ct. 357], holding the Fourteenth Amendment guarantees that "all . . . should have *like access to the courts* of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts . . . .") (*Id.,* at p. 31 [28 L.Ed. at p. 925].) (Italics added.)

[7](See also *Boddie* v. *Connecticut* (1971) 401 U.S. 371, 374 [28 L.Ed.2d 113, 117, 91 S.Ct. 780] ["[N]o characteristic of an organized and cohesive society is more fundamental than its erection and enforcement of a system of rules . . . enabling [its members] to . . . settle their differences in an orderly . . . manner."].)

[8]The last phrase is quoted from *Powell* v. *Alabama* (1932) 287 U.S. 45, 69 [77 L.Ed. 158, 170-171, 53 S.Ct. 55]. The *Powell* opinion, of course, decried the helplessness of unrepresented criminal defendants in capital cases. However, on the issue of whether "access" without a lawyer represents any "meaningful access" at all to the courts, the *Powell* holdings and those found in criminal cases apply with equal force to civil litigation as it is conducted in our regular trial courts. (See, e.g., *Gideon* v. *Wainwright, supra,* 372 U.S. 335, 344 [9 L.Ed.2d 799, 805] "[R]eason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a

and *Brooks* the right to have a lawyer in a civil case is itself a constitutional right and hence presumptively a fundamental interest.[9]

Denying the assistance of a free lawyer to indigent civil litigants invokes the *suspect classification* of poverty to deprive poor people of their *fundamental interests* in "like access to the courts" and to a "hearing where they have the assistance of counsel." Consequently, under either prong of constitutional equal protection analysis, or both, the state can justify continued denial of this right only if it can demonstrate a compelling interest. In *Payne,* the California Supreme Court already has considered and rejected nearly every conceivable claim the state might muster to assert a compelling interest in depriving indigents of free counsel. (*Payne* v. *Superior Court, supra,* 17 Cal.3d at pp. 919-922.) Accordingly, failing to appoint free counsel for indigent civil litigants also deprives them of their rights under the equal protection clause.

### C. Denial of Counsel to Indigent Civil Defendants Cannot Be Justified by the Nominal Burdens This Right Might Impose on the Courts or the Legal System

Fears about "intolerable burdens" on the legal system cannot justify ignoring the common law or constitutional rights to counsel in civil cases. Most other Western democracies have lived for decades or even centuries with a comprehensive legal entitlement to free counsel in civil cases. Poor

---

lawyer, cannot be assured a fair trial unless counsel is provided for him. This seems to us to be an obvious truth.")

The United States Supreme Court likewise has recognized the indispensability of counsel to fair proceedings in civil cases as well. "Laymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries. . . ." (*Railroad Trainmen* v. *Virginia Bar* (1964) 377 U.S. 1, 7 [12 L.Ed.2d 89, 94, 84 S.Ct. 1113] [in case upholding right of union to provide legal assistance plan for its members].)

What the court has termed an "obvious truth" is buttressed by empirical studies demonstrating unrepresented litigants rarely prevail in the same types of civil proceedings where those with lawyers often do. (See, e.g., Schmertz, *The Indigent Civil Plaintiff In The District Of Columbia: Facts And Commentary* (1967) 27 Fed.B.J. 235, 243, reporting a comparative study of pro. per. and represented civil litigants where the pro. per. litigants were so confounded by the procedural complexities that they proved nine times *less* likely to achieve a settlement, never succeeded in compelling discovery and in no case managed to reach a trial on the merits.) (See also Rubin, Consumers and Courts (1971) p. 109, reporting on a four-city study which found civil defendants with lawyers six times more successful than those unable to obtain counsel.)

[9]*San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1 [36 L.Ed.2d 16, 93 S.Ct. 1278], "[T]he key to discovering whether [a right] is 'fundamental' . . . lies in assessing whether [the right is] explicitly or implicitly guaranteed by the Constitution." (*Id.,* at pp. 33-34 [36 L.Ed.2d at p. 43]; cf., *Serrano* v. *Priest, supra,* 18 Cal.3d at pp. 767, 768, fn. 48, holding the constitutional status of an interest under the California Constitution is to be accorded significant but not conclusive weight in determining whether it qualifies as a "fundamental interest" for purposes of equal protection.)

people in England, for instance, have held this right since 1495. The right has existed in Germany since it became a nation in 1871, and in most of the constituent German states since the fifteenth and sixteenth centuries. (Klauser & Riegert, *Legal Assistance In The Federal Republic Of Germany* (1971) 20 Buffalo L.Rev. 583, 584-585.) The French legal system has managed to survive with a statutory right to counsel since 1851, Sweden since 1919 and Italy's constitutional right dates to 1923. (Cappelletti & Gordley, *Legal Aid: Modern Themes and Variations* (1971) 24 Stan.L.Rev. 347; Ginsburg & Bruzelius, *Professional Legal Assistance In Sweden* (1962) 11 Int'l & Comp. L.Q. 997, 1021, fn. 14.) In 1937, the Swiss Supreme Court construed the "equality before the law" clause of that nation's constitution to mandate appointment of free counsel for indigents in all civil cases where "the trial demands knowledge of the law." (Judgment of Oct. 8, 1937, Arrets du Tribunal Federal [ATF] 63 I 209 translated in O'Brien, *Why Not Appointed Counsel In Civil Cases? The Swiss Approach* (1967) 28 Ohio St. L.J. 1, 5-7.) None of these nations has experienced a breakdown of its legal system since instituting a right to counsel. Nor has any found it necessary to retreat from this commitment to equal justice for poor people. Indeed the trend in these nations consistently has been in the direction of expanding and perfecting the right to counsel, not toward contracting it. (Cappelletti & Gordley, *supra.*) Thus there is ample historical precedent a right to counsel in civil cases can be implemented without overburdening the courts or the legal profession.

Of course, even if recognizing a right to counsel imposed substantial burdens on the California legal system, that would not justify the courts in denying free counsel to indigent Californians. Official convenience has never been a prerequisite for enjoyment of constitutional or common law rights; judicial discomfort should not be allowed to excuse denial of those rights.

### 1. *Legal Theories Exist Supporting Compensation of Appointed Counsel*

It is not a sufficient response merely to refer all indigent civil defendants to legal aid. Unless a court stands ready to appoint counsel for the many poor people who must be turned away by financially starved legal aid organizations,[10] this referral in no way satisfies the common law or constitu-

---

[10]Even before their budgets were slashed some 25 percent and more during the past four years, legal aid organizations could not claim to be serving even a quarter of the poor people needing legal assistance. In Los Angeles for instance, legal aid could only meet about 15 percent of the estimated need. (L.A. Times, Aug. 31, 1977, pt. II, at p. 3, col. 2.) Now many offices have been forced to close their doors entirely to new clients or to severely cut back on intake. But even if legal aid organizations were able to represent 99 percent of indigent litigants, the common law and constitutional rights to counsel would require trial courts to appoint counsel for the 1 percent who were beyond the capacity of legal aid.

tional duties to guarantee the assistance of counsel to indigent civil litigants. Indeed petitioner Quail alleges he sought assistance from legal aid. Given the well known plight of legal services organizations at the present time, it is not surprising to learn he was denied legal assistance from this source. Thus, we must look to appointment of counsel from the private bar to fully effectuate the right to counsel in civil cases.

As of the writing of this opinion, the California government has not appropriated funds to compensate lawyers appointed to represent indigent civil defendants. However, this failure to provide public compensation for appointed counsel cannot justify denial of the indigent's common law and constitutional rights to free counsel. (*Payne* v. *Superior Court, supra,* 17 Cal.3d at p. 920, fn. 6.)

We are not faced in this case with an appointed lawyer's claim to public compensation for the services he or she is required to supply to an indigent civil litigant. But were the claim before this court there are tenable grounds for finding a constitutional right to compensation. A few courts in other jurisdictions have held public payment is required to avoid a taking of the lawyer's property right in his work product without the just compensation demanded by due process. (*Bradshaw* v. *Ball* (Ky. 1972) 487 S.W.2d 294; *Dillon* v. *United States* (D.C.Ore. 1964) 230 F.Supp. 487, revd. *United States* v. *Dillon* (1965) 346 F.2d 633, cert. den. 382 U.S. 978 [15 L.Ed.2d 469, 86 S.Ct. 550].) This is far from the majority rule, however. For contra authority see, e.g., *Presby* v. *Klickitat County* (1892) 5 Wash. 329 [31 P. 876]; *Tyler* v. *Lark* (9th Cir. 1973) 472 F.2d 1077; *United States* v. *Dillon, supra,* 346 F.2d 633), holding that lawyers have a duty to represent without compensation in furtherance of their duties as officers of the court.[11]

---

[11]In Austria, which long ago created a legal right to counsel for indigent civil litigants, the supreme court recently recognized a companion right to compensation for lawyers appointed to provide this representation to indigents. (Verfassungsgerichtshof [Constitutional Court], *Decision of December 19, 1972* Suppl. [Beliege] [Feb. 1973]; Osterrechisches Anwaltsblatt, excerpted in Cappelletti et al, Toward Equal Justice: A Comparative Study of Legal Aid in Modern Societies [1975] p. 721.) The lawyer's argument was based on the Austrian constitution's guarantee of "equality before the law" and the European Convention on Human Rights' prohibition against "forced labor." Significantly, the court did not hold declaration of this right for lawyers meant that indigent litigants should go without representation. Instead it held the government was compelled to furnish the necessary public funds. Along the way, the Austrian supreme court dealt with the contention that lawyers should serve without compensation because of their monopoly position over access to the courts:

"To be sure, the government pointed out . . . the professional position of the lawyer is different from that of other professions because the lawyer is 'an organ of the administration of justice' and, as such, the system gives him a monopoly over legal representation and advice which has significant economic advantages. But, even if this proposition is true, it does not justify the obligation of the attorney to serve without compensation since there are other professions which enjoy similar monopolies without the attendant obligation to serve

Beyond the lawyer's due process claims to compensation two other grounds could justify awarding relief to an appointed counsel. First is the indigent litigant's constitutional right to equal protection of the law. Both theory and reality establish that lawyers will provide more thorough and dedicated representation if they are compensated for that work. Hence indigent litigants represented by uncompensated appointed attorneys would suffer a denial of equal protection compared to litigants who can afford to pay their lawyers. Admittedly, this class of indigent litigants would be much better off with uncompensated counsel than without any counsel at all. Nonetheless, what they would enjoy is far from equal protection of the laws. Their equal protection rights especially when coupled with the lawyers' due process claim to compensation would merit a serious hearing.

Finally, the courts themselves have both the interest and arguably possess the power to insure both adversaries are represented by well-motivated, adequately compensated counsel. This is but a further expression of the judiciary's inherent power to insure its ability to properly perform its responsibility of fairly deciding the cases which come before the courts. (*Millholen* v. *Riley* (1930) 211 Cal. 29 [293 P. 69], holding court has inherent power to appoint and fix compensation of law clerk; *Brydonjack* v. *State Bar* (1929) 208 Cal. 439 [281 P. 1018]; *Hart Bros. Co.* v. *County of L.A.* (1939) 31 Cal.App.2d Supp. 766 [82 P.2d 221], holding court has inherent power to provide free food and lodging to jurors.)

The rationale for this inherent power was well expressed by the Massachusetts Supreme Court in ordering a county treasurer to pay for a tape recorder and tapes required by a trial court: "It is axiomatic that, as an independent department of government, the judiciary must have adequate and sufficient resources to ensure the proper operation of the courts. It would be illogical to interpret the Constitution as creating a judicial department with awesome powers over the life, liberty, and property of every citizen while, at the same time, denying to the judges authority to determine the basic needs of their courts as to equipment, facilities and supporting personnel. Such authority must be vested in the judiciary if the courts are to provide justice, and the people are to be secure in their rights, under the Constitution." (*O'Coins, Inc.* v. *Treasurer of County of Worcester* (1972) 362 Mass. 507 [287 N.E.2d 608, 611-612].)

In other states, this inherent power has been employed to mandate appropriation of additional funds to the judicial branch to cover expenditures

---

without compensation (e.g., the druggist and the doctor). Thus, the government's allusion to the professional duty connected with certain professions is unsound because in other professions the duty does not carry with it an obligation to serve without pay." (*Id.*, at p. 724.) A similar argument has been urged in California. (See dissenting opinion in *County of Fresno* v. *Superior Court* (1978) 82 Cal.App.3d 191, 207 [146 Cal.Rptr. 880].)

necessary to the effective and fair administration of justice. (See, e.g., *Commonwealth* ex. rel. *Carroll* v. *Tate* (1971) 442 Pa. 45 [274 A.2d 193]; *Judges for Third Judicial Cir.* v. *County of Wayne* (1969) 383 Mich. 10 [172 N.W.2d 436]; *O'Coins, Inc.* v. *Treasurer of County of Worcester, supra,* 287 N.E.2d 608; Annot., Inherent Power of Court to Compel Appropriation or Expenditure of Funds for Judicial Purposes, 59 A.L.R.3d 569; Comment, *Judge's Power to Bind Contractually County Treasury for Courtroom Necessities* (1973) 7 Suffolk L.Rev. 1136.) In several states, moreover, courts have construed their inherent powers to include mandating appropriation of public funds to pay attorney fees for appointed counsel. (See, e.g., *Commonwealth* ex. rel. *Carroll* v. *Tate, supra,* 442 Pa. 45, and the Illinois, Indiana, Iowa, New Jersey, and Wisconsin cases collected in 59 A.L.R.3d 569.)

California courts thus far have shied from invoking this inherent power for the purpose of compensating appointed counsel. In the meantime, however, this state has chosen to use an adversary system to resolve civil disputes in its superior courts. California also has chosen to implement this adversary system through a highly technical process which can only be negotiated by educated and skilled lawyers. Thus, the California courts cannot effectively and fairly administer justice to civil litigants unless both adversaries are represented by competent legal counsel. When one side lacks such representation, the entire system breaks down. In effect, lawyers are as essential to the "proper operation of the courts" as are the law clerks, probation officers, and the like which courts have already found they can compel legislative bodies to fund. (See, e.g., *Millholen* v. *Riley, supra,* 211 Cal.29; *Nicholl* v. *Koster* (1910) 157 Cal.416 [108 P. 302]; cases collected in 59 A.L.R.3d 569, *supra.*)

*2. The Burden of Uncompensated Service, if Required, Should Not Be Overstated and Cannot Justify Denying Right to Counsel to Indigent Civil Defendants*

No one can dispute the legal profession has a legitimate concern its members not suffer undue economic harm. As discussed above, whether this concern rises to constitutional dimension is a serious issue. However, it is one which the Supreme Court recently put on the "judicial back burner" along with other possible grounds for ordering the state to compensate appointed counsel (*Yarbrough* v. *Superior Court* (1985) 39 Cal.3d 197 [216 Cal.Rptr. 425, 702 P.2d 583].) Thus, final resolution of this question must await future litigation. However, when it does take this question off the "back burner" I would urge the Supreme Court to seriously consider a claim our judicial branch has the right and duty to order compensation for lawyers appointed to provide the representation essential to the proper func-

tioning of the trial courts. In the long run, nothing less appears capable of insuring our courts will deliver the oft promised but long delayed "equal justice under law."

On the other hand, even if the burden ultimately is placed on the legal profession to provide unpaid representation in cases akin to this one, we should not overstate this burden. Petitioner is a defendant. To grant him relief would not necessarily entail recognition of a right to counsel for civil plaintiffs.

Nor would the right proposed in this opinion require appointment of free counsel to raise frivolous defenses or to defend insubstantial cases where an affluent litigant would not bother to employ a lawyer. In administering the common law in forma pauperis right it absorbed from England, California has allowed trial courts to inquire whether an indigent litigant has a "substantial right to enforce or preserve" before granting relief. (*Majors* v. *Superior Court of Alameda Co.* (1919) 181 Cal. 270, 280 [184 P. 18]; *Martin* v. *Superior Court, supra,* 176 Cal. at p. 299; *Willis* v. *Superior Court* (1933) 130 Cal.App. 766, 768 [20 P.2d 994]; 2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 218, p. 1075.) This is in accord with the practice in England[12] and other nations which have recognized a legally enforceable right to counsel for civil litigants.[13] In California, moreover, this inquiry frequently has been accomplished by requiring an attorney to review the indigent's case and file an affidavit as to its "substantiality." (*Martin* v. *Superior Court, supra,* 176 Cal. at p. 299; *Willis* v. *Superior Court, supra,* 130 Cal.App. 766, 768; 2 Witkin, *op. cit. supra,* at p. 1075.)

Implementation of this right also would not deprive the legal profession of any compensated cases. If the prospects of a contingent fee appear sufficient to attract the services of a private lawyer, the trial court can appropriately deny immediate appointment of free counsel and instruct the applicant to seek private compensated counsel on a contingent fee or similar basis. Only if the applicant returns with evidence that several lawyers with

---

[12]England now uses committees of solicitors who review applications for legal aid. These committees apply a single test—would a person of adequate but modest means employ a lawyer to prosecute or defend this claim given the interests at stake and the prospects of a successful outcome. Matthews and Oulton, Legal Aid and Advice (1971) pages 124, 127.

[13]In Germany, the judges themselves decide whether free counsel is to be provided and apply the following test: "[T]he prosecution or defense of the case must not be unreasonable, i.e., the case must be of such a character that a reasonable man who is able to pay the costs would not desist from bringing proceedings." 2 Manual of German Law (2d ed. 1971) page 189. Sweden uses local committees composed of lawyers, government officials and common citizens to screen applications for free lawyers. These committees likewise ascertain whether the applicant has "a justifiable interest in the disposition of the matter for which he seeks aid." (Pub. Legal Aid L., 8 (6), SFS 1972:429 (May 26, 1972).)

varying degrees of experience refused to represent him or her need the court reopen consideration of appointing free counsel.[14]

I do not mean to imply any court would welcome imposing a duty on lawyers to furnish their services to indigent civil litigants without compensation even after finding such representation warranted. Nor do I suggest it would be fair to those lawyers. But better that than a sizable proportion of our population be deprived of property and other vital interests in violation of their common law and constitutional rights to counsel. The legal profession can look to the legislature for the same relief it already has gained in criminal cases, modest if admittedly not generous public compensation for services rendered to indigents.[15] What is not defensible, morally or professionally (see ABA Code of Prof. Responsibility, canon 2), is to deny poor people effective access to the courts while waiting for the Legislature or the Supreme Court to authorize compensation for members of the legal profession.[16]

---

[14]At the same time, it cannot be denied that many indigent civil litigants, especially defendants, need counsel yet are involved in cases for which a contingent fee or similar fee arrangement is not a feasible alternative. Petitioner's case, for example, appears to be one where a contingent fee is out of the question.

[15]When constitutional rights are at stake it is not necessary that broad public support exists for the appropriations required to implement those rights. But if this support were important it apparently is there for the adequate funding of counsel for indigent litigants. A public opinion survey commissioned by the National Center for State Courts reports fully 71 percent of the general public favor spending their tax dollars to "make good lawyers available to anyone who needs them," the second most popular item on the list of 13 possible areas of justice system expenditure mentioned in the poll. By way of comparison, less than half that number—32 percent—desire to see their taxes devoted to building more prisons, only 35 percent to expanding the size of the federal judiciary and 50 percent to increasing the number of police. National Center for State Courts, State Courts: A Blueprint for the Future (1978) page 56.

[16]There is another way out of the dilemma posed by the indigent civil defendant's right to free counsel versus the appointed counsel's right to compensation. That option is to bar the represented plaintiff from proceeding with his claim in the courts against the unrepresented defendant. This procedural approach would rest on a holding the government cannot be compelled to pay for the lawyers who are essential to a fair hearing for indigent civil defendants. At the same time, the courts cannot constitutionally sanction a deprivation of property based on a proceeding where the defendant is denied a fair hearing. Consequently, the courts are not open to lawsuits against defendants the public is not affording a fair hearing and the plaintiff's case must be dismissed (or at least cannot proceed unless and until the defendant acquires the means to employ a lawyer). Of course, this would not necessarily have to foreclose the plaintiff from going ahead if he were willing to pay into the court—or some special fund—the cost of allowing the defendant a fair hearing, i.e., legal fees for an appointed counsel.

In no sense do I recommend this as a happy solution to the problem. It would deny the represented plaintiff the use of the judicial system to resolve his dispute with another citizen. This seems fundamentally unfair to that innocent plaintiff. (On the other hand, it is hard to see how it is more unfair than forcing an innocent indigent defendant to attempt to defend himself without counsel in our courts.) At least this approach would prevent the courts from continuing to serve as aiders and abettors in deprivations of property without due process

## CONCLUSION

For the reasons recited above, I would be inclined to grant outright petitioner's request for appointment of counsel on appeal. But in an abundance of caution I would refer the matter to the trial court for a factual determination as to petitioner's mental competence. If the trial court reported his mental condition substantially impairs his ability to represent himself in these legal proceedings I would appoint counsel to represent him before the appellate department—and any further proceedings before this court—for the reasons set forth in section I above. Moreover, for the same reason, should the case be remanded for retrial, I also would order the trial court to appoint counsel to represent him in those proceedings.

If the trial court reported petitioner Quail was not mentally incompetent to effectively represent himself but nonetheless was indigent, I would still appoint counsel for him both at the appellate and trial levels for the reasons set forth in section II above.

It is now some seven centuries since the barons of England extracted the Magna Carta from King John, including the pledge: "To no one will we sell, to no one will we refuse or delay, right or justice." (Magna Carta, cap. 40.) It is nearly five centuries since King Henry VII guaranteed poor Englishmen the right to free counsel in civil cases. And it is nearly 70 years since our own California Supreme Court reminded us, "[I]mperfect as was the ancient common-law system, harsh as it was in many of its methods and measures, it would strike one with surprise to be credibly informed that the common-law courts . . . shut their doors upon . . . poor suitors . . . . Even greater would be the reproach to the system of jurisprudence of the state of California if it could be truly declared that in this twentieth century, . . . it had said the same thing . . . ." (*Martin* v. *Superior Court, supra,* 176 Cal. at p. 294.)

It is far too late in the 20th century, far too late in the history of our state for California courts to effectively "shut their doors upon . . . poor suitors" by denying them the assistance of counsel in civil litigation. No one seriously contends poor Californians have the slightest chance in our civil courts unless they are given lawyers free of charge. Yet at present a poor person has to commit a crime before society cares enough to guarantee him

of law (and without equal protection and common law procedural rights). Perhaps more significantly, if one sits down and fully contemplates this possibility, it makes explicit the discrimination which otherwise remains concealed in our current practice. In reality, we are choosing the represented plaintiff's right to effectively prosecute over the indigent defendant's right to effectively defend. This preference certainly is not compelled by the constitution nor is it easily defended as a matter of policy.

a fair shake in our judicial system. Poor people can no longer be expected to bear and our state should no longer tolerate the continued denial of counsel in civil cases nor the injustice this denial guarantees.

Petitioner's application for review by the Supreme Court was denied October 17, 1985. Bird, C. J., Broussard, J., and Reynoso, J., were of the opinion that the application should be granted.